

FILED BY ___*Tpl*___ D.C.

**Jul 23, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIA

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 25-CR-60249-Leibowitz |
| | ) | |
| CHELSEA MICHELLE ANN COX, | ) | |
| | ) | |
| *Defendant*. | ) | |

# MEMORANDUM OF COURT-APPOINTED *AMICUS CURIAE*

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES.................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

DISCUSSION ......................................................................................................... 13

I.     Because §611 Is Best Read To Set A Voter Qualification Requirement In Federal Elections, It Is Likely Unconstitutional. .............. 14

     A.     States—Not The Federal Government—Control Voter Qualifications. ................................................................................. 15

     B.     History And Precedent Indicate That a Citizenship Requirement is a Voter Qualification. ........................................... 21

     C.     Section 611 Effectively Sets a Voter Qualification.......................... 26

II.     Arguments In Favor Of §611's Constitutionality Face Substantial Obstacles. .......................................................................................... 28

     A.     Some Precedent Suggests Congress May Set Voter Qualifications, But The Supreme Court's Latest And Most Apposite Precedent, *ITCA*, Says Otherwise................................... 28

     B.     Congress' Power Over Immigration is Undoubtedly Substantial, But That Does Not Empower Congress to Disturb The Constitution's Express Resolution of Questions Concerning Voter Qualifications.................................................. 31

     C.     Holding §611 Unconstitutional May Have Significant Consequences, But That Does Not Alter The Constitutional Analysis. ............................................................................................ 41

CONCLUSION ....................................................................................................... 43

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013)...................................................................*passim*

*Arizona v. United States*,
567 U.S. 387 (2012)............................................................. 31

*Barton v. Barr*,
590 U.S. 222 (2020)............................................................. 13

*Bluman v. FEC*,
800 F.Supp.2d 281 (D.D.C. 2011) ................................................ 40

*Bond v. United States*,
564 U.S. 211 (2011) ............................................................. 38

*Burroughs v. United States*,
290 U.S. 534 (1934).................................................... 28, 32, 34

*Bush v. Gore*,
531 U.S. 98 (2000)............................................................. 16

*Chiafalo v. Washington*,
591 U.S. 578 (2020)............................................................. 16

*Dorsey v. Brigham*,
177 Ill. 250 (1898) ............................................................. 20

*Dred Scott v. Sandford*,
60 U.S. 393 (1857)............................................................. 23

*Ex parte Siebold*,
100 U.S. 371 (1880)............................................................. 39

*Foley v. Connelie*,
435 U.S. 291 (1978)............................................................. 25

*Haaland v. Brackeen*,
599 U.S. 255 (2023)............................................................. 32

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ................................................................................. 31

*Husted v. A. Philip Randolph Inst.*,
   584 U.S. 756 (2018) ................................................................................. 16

*I.N.S. v. St. Cyr*,
   533 U.S. 289 (2001) ................................................................................. 12

*In re Opinion of Justices*,
   7 Mass. 523 (1811) .................................................................................... 7

*Jones v. Governor of Fla.*,
   975 F.3d 1016 (11th Cir. 2020) ................................................................ 21

*Katzenbach v. Morgan*,
   384 U.S. 641 (1966) ............................................................................ 15, 16

*Kusper v. Pontikes*,
   414 U.S. 51 (1973) ................................................................................... 29

*Minor v. Happersett*,
   88 U.S. 162 (1874) ............................................................................ 2, 9, 24

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023) ................................................................................. 30

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ..........................................................................*passim*

*Pereida v. Wilkinson*,
   592 U.S. 224 (2021) ................................................................................. 12

*Pope v. Williams*,
   193 U.S. 621 (1904) ................................................................................. 25

*Printz v. United States*,
   521 U.S. 898 (1997) ................................................................................... 7

*Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
   158 F.4th 1227 (11th Cir. 2025) ............................................................... 40

*Smiley v. Holm*,
  285 U.S. 355 (1932)............................................................... 28, 32, 34

*Spragins v. Houghton*,
  3 Ill. 377 (1840) ...................................................................... 7, 22

*Sugarman v. Dougall*,
  413 U.S. 634 (1973)....................................................................... 25

*Tashjian v. Republican Party of Conn.*,
  479 U.S. 208 (1986)....................................................................... 18

*Trump v. Barbara*,
  2026 WL 1870543 (U.S. June 30, 2026)....................................................... 9

*United States v. Hansen*,
  599 U.S. 762 (2023) ........................................................................ 3

*United States v. Lopez*,
  514 U.S. 549 (1995)....................................................................... 39

*United States v. Marengo Cnty. Comm'n*,
  731 F.2d 1546 (11th Cir. 1984) ........................................................... 30

*United States v. Pope*,
  871 F.2d 506 (5th Cir. 1989)............................................................. 39

*United States v. Salerno*,
  481 U.S. 739 (1987)....................................................................... 38

*United States v. Singh*,
  979 F.3d 697 (9th Cir. 2020)............................................................. 40

*Voting Rts. Coal. v. Wilson*,
  60 F.3d 1411 (9th Cir. 1995)............................................................. 28

*Watson v. RNC*,
  2026 WL 1855462 (U.S. June 29, 2026)...................................................... 17

**Constitutional Provisions**

Conf. Const. of Mar. 1861, art. I, §1, cl.1 ....................................................... 23

Ohio Const. of 1802, art. IV, §1 .................................................................. 6

U.S. Const. amend. X............................................................................................. 15

U.S. Const. amend. XIV............................................................................................ 9

U.S. Const. amend. XV......................................................................................... 10

U.S. Const. amend. XVII.................................................................................10, 11, 15

U.S. Const. amend. XIX................................................................................................11

U.S. Const. art. I, §2................................................................................................. 6, 20

U.S. Const. art. I, §2, cl. 1 ..................................................................................... 5, 15

U.S. Const. art. I, §2, cl. 2 ................................................................................. 23, 34

U.S. Const. art. I, §3, cl. 3 ....................................................................................... 23

U.S. Const. art. I, §4, cl. 1 ................................................................................ 6, 17, 33

U.S. Const. art. I, §8, cl. 4 ........................................................................................ 31

U.S. Const. art. I, §8, cl. 17 ..................................................................................... 38

U.S. Const. art. II, §1, cl. 2....................................................................................... 16

U.S. Const. art. II, §1, cl. 5........................................................................................ 23, 34

U.S. Const. art. II, §2, cl. 2........................................................................................ 20

U.S. Const. art. IV, §4 ............................................................................................... 39

U.S. Const. art. V.......................................................................................................... 42

U.S. Const. art. VI, cl. 3 ............................................................................................ 21

**Statutes**

8 U.S.C. §1227(a)(6)................................................................................................ 36, 37

18 U.S.C. §611 ...................................................................................................*passim*

18 U.S.C. §611(a) ................................................................................................*passim*

18 U.S.C. §611(b)........................................................................................................ 12

18 U.S.C. §611(c) ...................................................................... 12

52 U.S.C. §30121(a) ............................................................. 40, 41

52 U.S.C. §30121(b) .................................................................. 40

H. J. Res. 152, 119th Cong. (2026) ............................................ 42

Northwest Ordinance, §9 (July 13, 1787) .................................... 4

Pub. L. No. 104-208, Div. C, 110 Stat. 3009................................ 12

**Other Authorities**

2 *The Records of the Federal Convention of 1787*
(Max Farrand ed., 1911) .............................................. 5, 17, 18, 33

142 Cong. Rec. (1996) ........................................................... 13, 40

*Alien Voters in the States*, 2 Const. Rev. 176 (1918)................... 10, 25

Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Poli. Sci. Rev.
114 (1931) .....................................................................10, 11, 22

Thomas M. Cooley, *A treatise on the constitutional limitations which rest
upon the legislative power of the States of the American Union* (1868).......... 24

James A. Gardner, *Liberty, Community and the Constitutional Structure
of Political Influence: A Reconsideration of the Right to Vote*, 145 U.
Pa. L. Rev. 893 (1997)................................................................ 17

Graves Garrett Greim, Memorandum to Americans for Citizen Voting
(Apr. 15, 2026), https://perma.cc/8HJN-SU45 ............................ 26

Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and
Current Prospects for Change*, 18 Law & Ineq. 271 (2000)........................ 4

Ron Hayduk, *Immigrant Voting Rights and the Quest for Universal
Suffrage*, 60 Harv. C.R.-C.L. L. Rev. 317 (2025) ...................................11, 22

Brian C. Kalt, *Unconstitutional but Entrenched: Putting UOCAVA and
Voting Rights for Permanent Expatriates on A Sound Constitutional
Footing*, 81 Brook. L. Rev. 441 (2016)....................................... 41

vi

Alan H. Kennedy, *Voters in a Foreign Land:  Alien Suffrage in the United States*, *1704-1926*, 34 J. Pol'y Hist. 245 (2022) ............................................... 6

Alexander Keyssar, *The Right to Vote:  The Contested History of Democracy in the United States* (rev. ed. 2009) ...................................... 7, 8, 9

Joshua Kleinfeld & Stephen E. Sachs, *Give Parents the Vote*, 100 Notre Dame L. Rev. 1201 (2025)...................................................................... 27

M. A. Lesser, *Citizenship and Franchise*, 4 Colum. L. T. 113 (1891)................. 24

Jan Ellen Lewis, *Rethinking Women's Suffrage in New Jersey,  1776-1807*, 63 Rutgers L. Rev. 1017 (2011) ....................................................................... 4

Stephen E. Mortellaro, *The Unconstitutionality of the Federal Ban on Noncitizen Voting and Congressionally-Imposed Voter Qualifications*, 63 Loy. L. Rev. 447 (2017)................................................................... 26

Derek T. Muller, *Twenty-Third Amendment Problems Confronting District of Columbia Statehood*, 2021 Harv. J.L. & Pub. Pol'y Per Curiam 11 (2021)........................................................................... 43

Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U. Pa. J. Const. L. 1 (2010)................................ 17, 21

National Council of State Legislatures, "Legislative Approaches to Ensuring Only Citizens Vote," (Apr. 27, 2026) https://www.ncsl.org/elections-and-campaigns/legislative-approaches-to-ensuring-only-citizens-vote ................................................................. 26

Gerald L. Neuman, *"We Are the People": Alien Suffrage in German and American Perspective*, 13 Mich. J. Int'l L. 259 (1992)............................. 8, 10

Opp'n. to Mot. to Dismiss at 1, *United States v. Murillo*, No. 3:26-mj-00004-amb (W.D. Wis. filed May 15, 2026), Dkt.17 ............................. 31, 35

Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391 (1993) ...............................................................*passim*

Gerald M. Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote*, 75 Mich. L. Rev. 1092 (1977)......................................................... 7, 8

Jeffrey Rosen, *Divided Suffrage*, 12 Const. Comment. 199 (1995) ...................... 19

Andrew C. Scarafile, *Regulation or Qualification: The Qualifications Clause, the Elections Clause, and Federal Regulation of Mail-in Ballots*, 36 Notre Dame J.L. Ethics & Pub. Pol'y 709 (2022) ........................ 35

Bradley A. Smith, *Wall St. J.*, *The Constitution Could Let Noncitizens Vote* (Apr. 6, 2026), https://www.wsj.com/opinion/the-constitution-could-let-noncitizens-vote-bee06b3f ............................................................ 26

Nicholas O. Stephanopoulos, *The Sweep of the Electoral Power*, 36 Const. Comment. 1 (2021) .................................................................... 27, 29

Joseph Story, *Commentaries on the Constitution of the United States* §1972 (Thomas M. Cooley ed., 4th ed. 1873) ............................................... 19

The Federalist No. 52 (C. Rossiter ed. 2003) (J. Madison) ................................... 6

The Federalist No. 57 (C. Rossiter ed. 2003) (J. Madison) ............................. 5, 15

The Federalist No. 60 (C. Rossiter ed. 2003) (A. Hamilton) ......................... 18, 19

Voter Registration Rules, Vote.Org (2026), https://perma.cc/S4S7-GF9M ............ 11

**INTRODUCTION**

The Court appointed *amicus curiae* to address "the constitutional authority of Congress to enact 18 U.S.C. §611." Dkt.37 at 2.  Section 611 provides (as relevant here) as follows:  "It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, [or] Member of the House of Representatives."  18 U.S.C. §611(a).  The Constitution, however, generally requires the federal government to employ in federal elections the qualifications the states have adopted for the most numerous branch of their state legislatures.  As the Supreme Court has explained, states possess the "constitutional authority to establish qualifications (such as citizenship) for voting," so while Congress can "regulate *how* federal elections are held," it cannot regulate "*who* may vote in them."  *Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1, 16 (2013).  Understood as a voter qualification, §611 would contravene the "straightforward rule for the composition of the federal electorate"—states, not the federal government, determine voter qualifications.  *Id.*

The nation's history reinforces that conclusion.  For the last century or so, every state has made citizenship a pre-requisite to voting in federal elections.  But it was not always so.  In 1874, for instance, the Supreme Court observed that "citizenship has not in all cases been made a condition precedent to the enjoyment

of the right of suffrage," and noted that multiple states provided for alien suffrage. *Minor v. Happersett*, 88 U.S. 162, 177 (1874). By the time Congress enacted §611 in 1996, of course, noncitizen suffrage was a distant memory. But constitutional text and history both suggest that insofar as §611 is construed as a voter qualification, it goes beyond Congress' authority.

Still, contrary arguments have considerable force. On a broad reading of the various opinions in *Oregon v. Mitchell*, 400 U.S. 112 (1970), one could conclude that Congress can regulate voter qualifications. More narrowly, an argument could be made that Congress' sweeping power over immigration—paired with the Necessary and Proper Clause—allowed it to prohibit voting by aliens even if it must otherwise take state voter qualifications as a given. Perhaps most promisingly, §611 could be construed as simply a federal enforcement mechanism that is constitutional when applied in states that prohibit noncitizen voting. Section 611 could, on that reading, operate not as a verboten federal voting qualification, but as a permissible effort by the federal government to criminalize unlawful voting (as measured by state-law voting qualifications) by individuals of unique federal concern (aliens). That said, §611's "unless" clause, which carves out only a narrow exception for alien voting in non-federal elections when permitted by state law, complicates any such reading. *See* 18 U.S.C. §611(a).

2

On balance, then, it seems that the better view is that because §611 was intended to criminalize alien suffrage in federal elections, regardless of state law, it sets a voter qualification—which only the states may do. *See ITCA*, 570 U.S. at 16-17; *id.* at 29 (Thomas, J., dissenting) ("[T]ext and history confirm that States have the exclusive authority to set voter qualifications").  If that is right, then Congress overstepped constitutional bounds in enacting §611.

## BACKGROUND

1. Today, citizenship and voting are strongly associated with one another.  But that has not always been so.  For much of American history, many classes of citizens could not vote, while some noncitizens could.[1]

During the colonial era, many of the thirteen colonies focused on voter qualifications like property, race, and sex rather than citizenship.  As such, citizens who were black or female or lacked sufficient property usually could not vote, while white male noncitizens with enough property sometimes could.  Following the Revolution and in the era of the Articles of Confederation, scholars report that many states continued to permit noncitizens who were otherwise qualified to vote to cast ballots.  *See, e.g.*, Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391,

---

[1] Though "alien" and "noncitizen" are not exact synonyms, they are used as rough equivalents for purposes of this memorandum.  *See United States v. Hansen*, 599 U.S. 762, 770 n.1 (2023) (doing the same).

1399-1402 (1993) (hereinafter "Raskin"); Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18 Law & Ineq. 271, 273-74 (2000) ("[A]liens voted under the early Constitutions of Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Rhode Island, Vermont and Virginia, all of which granted the right to vote using the more general 'freemen' terminology."). Across the states, voter qualifications varied. *See, e.g.*, Jan Ellen Lewis, *Rethinking Women's Suffrage in New Jersey, 1776-1807*, 63 Rutgers L. Rev. 1017, 1018-20 (2011) (noting that New Jersey, for a brief time, allowed voting by propertied women, free blacks, and aliens). The Confederation Congress, too, allowed for some male, landowning noncitizens to vote in the Northwest Ordinance of 1787—presumably offering the prospect of suffrage to incentivize settlement of that territory.[2]

When the framers convened in Philadelphia during the summer of 1787, they debated the issue of voter qualifications at some length. Much of that discussion focused on whether the right to vote for members of the House of Representatives

---

[2] *See* Northwest Ordinance, §9 (July 13, 1787) ("That a freehold in fifty acres of land in the district, having been a citizen of one of the states, and being resident in the district, or the like freehold and two years residence in the district, shall be necessary to qualify a man as an elector of a representative."); Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 19 (rev. ed. 2009) (noting that "citizens and aliens alike had to own fifty acres of land in order to vote").

should be conditioned on some measure of property ownership.  Gouverneur Morris argued that the Constitution should "restrain the right of suffrage to freeholders."  2 *The Records of the Federal Convention of 1787* 201 (Max Farrand ed., 1911) [text available:  https://perma.cc/6W4G-ZU6E].  Others disagreed vigorously.  Oliver Ellsworth argued that any such limitation on voting would create headwinds that might prevent the Constitution from being ratified at all, observing that the "right of suffrage was a tender point" and that the people would "not readily subscribe" to a federal constitution that would "subject them to be disfranchised."  *Id.*  And James Wilson noted that "it was difficult to form any uniform rule of qualifications for all the States."  *Id*.

The framers ultimately settled on the following approach to voter qualifications for elections for the members of the House of Representatives: "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."  U.S. Const. art. I, §2, cl. 1.  With that language, James Madison explained, the Constitution set out a simple rule:  "The electors … are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State."  The Federalist No. 57, p. 349 (C. Rossiter ed. 2003) (J. Madison).  Put differently, rather than adopt some uniform national rule for qualifications to vote in elections for representatives in the federal Congress, the framers decided to piggyback on the voter qualifications adopted in

5

each state for its most numerous state legislative body, leaving no room for the new Congress to override the state qualifications or adopt a different uniform national rule. That approach to voter qualifications was in marked contrast with the approach adopted for rules concerning the time, place and manner of House and Senate elections where state legislatures were given authority subject to congressional override. *See* U.S. Const. art. I, §4, cl. 1. And, at the same time, it did not leave the matter wholly within "the legislative discretion of the States," either—for any rule which the states wished to set for elections to the House, they would need to abide by for their own legislature's analogous branch. *See* Federalist No. 52, p. 323 (C. Rossiter ed. 2003) (J. Madison). That voter-qualification rule, along with the rest of the Constitution, eventually won ratification. *See* U.S. Const. art. I, §2.

Following the ratification of the Constitution, noncitizen suffrage continued. On some accounts, "[a]ll thirteen original states offered noncitizens some form of suffrage by 1800." Alan H. Kennedy, *Voters in a Foreign Land: Alien Suffrage in the United States, 1704-1926*, 34 J. Pol'y Hist. 245, 252 (2022); *see id.* at 253-54 (noting that all states in existence in 1800, with the exception of Kentucky, allowed some noncitizens to vote). As the nation expanded, too, so did noncitizen suffrage. "In 1802, for example, the new State of Ohio enfranchised all 'white male inhabitants' twenty-one years old who had lived there for one year." Raskin at 1403 (quoting Ohio Const. of 1802, art. IV, §1).

6

Congress, at times, also embraced alien suffrage. To encourage immigration to the territories, Congress allowed some aliens to vote—including soon after ratification in the Northwest Ordinance of 1789. *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 27-28 (rev. ed. 2009) (hereinafter "Keyssar"); Gerald M. Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote*, 75 Mich. L. Rev. 1092, 1095-97 (1977); *cf. Printz v. United States*, 521 U.S. 898, 905 (1997) (explaining that "early congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning") (brackets and quotation marks omitted). Indeed, in the "congressional acts authorizing the election of representatives to statewide constitutional conventions in Ohio, Indiana, Michigan and Illinois, Congress deliberately extended the right to vote to aliens." Raskin at 1402.

Yet growing fears of foreign influence—stemming from growing immigration and the War of 1812—caused states to eliminate alien suffrage. Between 1800 and 1830, many states shifted away from granting suffrage to "inhabitant[s]" broadly and toward enfranchising "citizen[s]" only. *See* Keyssar at 27.[3] Virtually every state

---

[3] States may have done this to clear up confusion about whether aliens counted as "inhabitants." *See* Keyssar at 27 (noting "ambiguous wording"); *compare In re Opinion of Justices*, 7 Mass. 523, 525 (1811) (recognizing ambiguity but reasoning that with respect to voting, "the authority given to *inhabitants* and *residents* to vote, is restrained to such inhabitants and residents as are *citizens*"), *with Spragins v. Houghton*, 3 Ill. 377, 403 (1840) (rejecting the notion that "the words citizen and inhabitant can … be considered synonymous"). One scholar thus noted that a "good

joining the Union between 1800 and 1840 allowed only citizens to vote; Illinois was the sole exception. *Id.*

Yet noncitizen voting made a resurgence after Wisconsin pioneered "declarant alien" suffrage—*i.e.*, granting the right to vote to aliens who had lived in the United States for some period (usually two years) and who had declared an intent to become citizens. *See* Keyssar at 110; Raskin at 1406-09. Wisconsin's model proved popular, especially in the Midwest, as it allowed noncitizen suffrage to serve as a part of the pathway to citizenship. Following Wisconsin's lead, states including Illinois, Michigan, and Indiana allowed "declarant aliens" to vote. *See* Raskin at 1407; *see also* Gerald L. Neuman, *"We Are the People": Alien Suffrage in German and American Perspective*, 13 Mich. J. Int'l L. 259, 298-99 (1992).

Following the Civil War, a host of states—at least thirteen—adopted declarant-alien suffrage, including the Reconstruction governments of Alabama, Florida, Georgia, South Carolina, and Texas. Raskin at 1414. Some of the expansion of noncitizen suffrage was perhaps spurred by a desire to attract immigrants; likewise, it may have reflected a view that "it was seen as only fair to grant the vote to white male aliens, many of whom had fought for, and indeed been drafted by, the

---

deal of doubt exists" as to how exactly "inhabitant" was understood, while also recognizing that laws like that permitted aliens to vote in the territories as well as South Carolina, Pennsylvania, and Illinois. *See* Gerald Rosberg, *Aliens and Equal Protection: Why Not the Right To Vote?*, 75 Mich. L. Rev. 1092, 1095-97 (1977).

8

North during the Civil War." *Id.*; *see id.* at 1409-10 (noting that the Union Army was at one point nearly a quarter "foreign-born"); Keyssar at 83 (noting that "declarant aliens, many of whom were serving or had served in the army, were enfranchised in ten states or federal territories in the 1860s"). Thus in 1874, the Supreme Court observed that "in Missouri, persons of foreign birth, who have declared their intention to become citizens of the United States, may under certain circumstances vote," and the same was true for "Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Minnesota, and Texas." *Happersett*, 88 U.S. at 177; *cf. Trump v. Barbara*, 2026 WL 1870543, at *74 (U.S. June 30, 2026) (Alito, J., dissenting) (noting that in the years before and after the Civil War, "[i]n some places, aliens could even vote and hold elective office").

Importantly, too, the post-war amendments limited the power of states to set certain discriminatory voting qualifications. Section Two of the Fourteenth Amendment promised to reduce the representation of any state which denied the right to vote "to any of the male inhabitants" of the state who were "citizens of the United States" and 21 or older—as long as the denial or abridgment of the right was not based on "participation in rebellion, or other crime." U.S. Const. amend. XIV. And the Fifteenth Amendment provided that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and empowered Congress

9

to enforce that provision with "appropriate legislation."  U.S. Const. amend. XV. But while those amendments specifically addressed *citizens'* voting rights,[4] the post-war period also saw a spread of noncitizen suffrage.  By the turn of the century, almost half the states and territories had some experience with voting by aliens, some for many decades.  *See* Raskin at 1415.

Yet as the nineteenth century ended and the twentieth began, noncitizen voting grew less popular.  State after state eliminated noncitizen voting.  *Id.* at 1415-17. Even so, as late as 1918, one commentator lamented the fact that seven or eight states still permitted alien voting during the midst of the First World War.  *See Alien Voters in the States*, 2 Const. Rev. 176, 176-78 (1918).  Many of those states changed their laws during (or shortly after) the war.  *See* Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Poli. Sci. Rev. 114, 115-16 (1931).

Meanwhile, as noncitizen voting became less popular, other measures expanded access to (and the power of) the ballot.  In 1913, the Seventeenth Amendment provided that Senators would be "elected by the people" from each state.  U.S. Const. amend. XVII.  That amendment borrowed Article I's rule for

---

[4]  That the Fifteenth Amendment protected only citizens from racial discrimination in the allocation of the franchise was, according to one scholar, a choice made in light of "a clear recognition that aliens did vote, and a fear that a broadly written amendment would force Pacific coast states to permit Chinese immigrants to vote."  Gerald L. Neuman, *"We Are the People": Alien Suffrage in German and American Perspective*, 13 Mich. J. Int'l L. 259, 307 & n.311 (1992).

10

selecting voters for the House of Representatives, providing that for the Senate, too, "[t]he electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." *Id*. Then, in 1920, the campaign for women's suffrage culminated in this addition to the Constitution: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex." U.S. Const. amend. XIX.

Not long after American women secured the vote, the last state to allow noncitizen suffrage eliminated it. Arkansas shifted to citizen-only voting in 1926. *See* Aylsworth, *supra*, at 116. So, "[f]or the first time in over a hundred years, a national election was held in 1928 in which no alien in any state had the right to cast a vote for a candidate for any office—national, state, or local." *Id*. at 114.

In the century since, that status quo has remained largely intact. At present, all 50 states require voters to be citizens. *See* Voter Registration Rules, Vote.Org (2026), https://perma.cc/S4S7-GF9M. Save for a few localities which permit noncitizen voting in purely local elections, only citizens may vote.[5]

2. That status quo prevailed in the mid-1990s when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

---

[5] *See* Ron Hayduk, *Immigrant Voting Rights and the Quest for Universal Suffrage*, 60 Harv. C.R.-C.L. L. Rev. 317, 332-33 (2025) (collecting information concerning cities and towns that permit limited noncitizen voting in local elections).

*See* Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (generally codified as amended in 8 U.S.C.).  IIRIRA "contain[ed] comprehensive amendments to the Immigration and Nationality Act (INA)," *I.N.S. v. St. Cyr*, 533 U.S. 289, 292 (2001), and the INA, in turn, "governs how persons are admitted to, and removed from, the United States." *Pereida v. Wilkinson*, 592 U.S. 224, 227 (2021).

IIRIRA included the provision which would be codified in 18 U.S.C. §611. As amended, that provision states:

> (a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless—
>
>> (1) the election is held partly for some other purpose;
>>
>> (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
>>
>> (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.
>
> (b) Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

18 U.S.C. §611(a)-(b).[6]

---

[6] As the government notes, §611(c) is "not applicable in this case."  Dkt.41 at 3.

When introducing §611 on the floor, Senator Alan Simpson offered a brief defense of its constitutionality. Acknowledging that "doubt has been expressed about whether Congress has the authority to prohibit voting by aliens," Senator Simpson emphasized "the plenary power of Congress over immigration matters," and "the clause that guarantees what is called a republican form of government." 142 Cong. Rec. S4018-19 (1996) (statement of Sen. Simpson). Section 611, along with the rest of IIRIRA, was eventually passed by Congress and signed by President Clinton. *Barton v. Barr*, 590 U.S. 222, 227 (2020).

## DISCUSSION

The question presented to this Court is one of first impression, and it is not straightforward. That said, the constitutional text, the country's history, and the Supreme Court's most recent precedent indicate that insofar as §611 is construed as a federal voter qualification disqualifying aliens from voting in federal elections, it violates the Constitution. In short, the Constitution assigns states (and states alone) the power to set voter qualifications, and citizenship is no exception. To be sure, Congress has broad powers over immigration, but that power does not override the express constitutional assignment of the authority over voting qualifications. And while one could treat §611 as constitutional as applied in cases where state law prohibits voting by aliens, §611's "unless" clause is a serious obstacle to that reading. By criminalizing noncitizen voting in all federal elections—and excepting only

13

distinct local elections in states that permit alien voting—§611 as a whole is most fairly read as a forbidden congressional effort to set a national voting qualification.

**I.      Because §611 Is Best Read To Set A Voter Qualification Requirement In Federal Elections, It Is Likely Unconstitutional.**

The argument that Congress crossed a constitutional line with §611 proceeds in three parts.  First, the Constitution does not allow the federal Congress to set voter qualifications; while Congress may override state rules concerning the time, place, and manner of congressional elections, it must take the state rules concerning voter eligibility as a given and employ the rules used for the state's most numerous legislative body in congressional elections.  Second, laws which establish who may vote—and who may not vote—set voter qualifications.  *ITCA*, 570 U.S. at 16 (states have "constitutional authority to establish qualifications (*such as citizenship*) for voting") (emphasis added).  Third, because §611 says noncitizens may not vote on pain of criminal penalties, it sets a voter qualification—which Congress may not do in the states.  *See id.* at 16-17; *id.* at 29 (Thomas, J., dissenting) ("States have the exclusive authority to set voter qualifications.").[7]  On that account, Congress exceeded its powers in enacting §611.

---

[7] As discussed below, the provision also has non-state applications (*e.g.*, to elections in the District of Columbia), which implicate questions distinct from those raised by §611's application to individuals in the states.  *See* 18 U.S.C. §611(a); *infra* at 38.

Case 0:25-cr-60249-DSL   Document 46   Entered on FLSD Docket 07/23/2026   Page 24 of 53

**A.** **States—Not The Federal Government—Control Voter Qualifications.**

With respect to those who vote in congressional elections, the Constitution provides a clear rule: "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I., §2, cl. 1; *see* U.S. Const. amend. XVII (for the Senate, providing that "The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislatures."). Because states set the voting qualifications for the "most numerous branch" of their state legislatures as an exercise of their residual sovereignty, *cf.* U.S. Const. amend. X, the states effectively set the qualifications for voting in federal elections by determining the qualifications needed to vote in state elections. *See* Federalist No. 57, p. 348-49 (C. Rossiter Eed. 2003) (J. Madison) ("Who are to be the electors of the federal representatives? … They are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State."); *Katzenbach v. Morgan*, 384 U.S. 641, 647 (1966) (explaining that "the qualifications established by the States for voting for members of the most numerous branch of the state legislature also determine who may vote for United States Representatives and Senators"). The federal Congress was given no authority to deviate from that regime, as the Constitution itself provides the rule of decision—namely, the state-law regime for each state's most numerous legislative body provides the rule for congressional

15

elections.   Thus, subject to other constitutional constraints like the Fifteenth Amendment, "[t]he Constitution gives States the authority to set the qualifications for voting in congressional elections." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 774 (2018); *cf. Katzenbach*, 384 U.S. at 647 ("[T]he States have no power to grant or withhold the franchise on conditions that are forbidden by the Fourteenth Amendment, or any other provision of the Constitution.").

As to presidential elections, states are directly granted wide discretion to choose their electors.   *See* U.S. Const. art. II, §1, cl. 2 (in electing the President, "[e]ach state shall appoint, in such manner as the Legislature thereof may direct, a number of electors").   With respect to presidential elections, it is not just a matter of states exercising their traditional sovereign authority to set qualifications for state elections with carryover effects on federal elections by virtue of a constitutional rule of decision, as is the case with congressional elections.   Instead, the Constitution grants states new power to set the qualification for presidential elections, and as the Supreme Court has explained, "the state legislature's power to select the manner for appointing [presidential] electors is plenary." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam).   Of course, other "constitutional constraint[s]" apply.   *Chiafalo v. Washington*, 591 U.S. 578, 588-89 (2020).   But otherwise, states enjoy broad discretion in setting qualifications for presidential elections.   *See Husted*, 584 U.S. at 780 (Thomas, J., concurring); Robert G. Natelson, *The Original Scope of the*

16

*Congressional Power to Regulate Elections*, 13 U. Pa. J. Const. L. 1, 21 (2010); James A. Gardner, *Liberty, Community and the Constitutional Structure of Political Influence: A Reconsideration of the Right to Vote*, 145 U. Pa. L. Rev. 893, 964 (1997) ("[T]hese provisions suggest that the United States Constitution *commits wholly* to the states decisions about who may vote in federal elections.") (emphasis added).

By affirmatively assigning power over voter qualifications to the states, the Constitution denied Congress that power. As Justice Stewart once detailed, the framers considered—and then rejected—an "early draft of the Constitution" which "provided that the States should fix the qualifications of voters in congressional elections subject to the proviso that these qualifications might 'at any Time be altered and superseded by the Legislature of the United States.'" *Oregon v. Mitchell*, 400 U.S. 112, 289 (1970) (Stewart, J., concurring in part and dissenting in part) (quoting 2 *The Records of the Federal Convention of 1787* 153 (Max Farrand ed., 1911)). That proposal would have treated voting qualifications the same as the rules for the "time, place, and manner" of congressional elections, where state legislatures are given initial authority subject to congressional override. *See* U.S. Const. art. I, §4, cl. 1; *Watson v. RNC*, 2026 WL 1855462, at *3 (U.S. June 29, 2026). But the framers consciously rejected that parallel treatment as "it was decided to strike the provision granting to Congress the [ultimate] authority to set voting qualifications," and to instead include language employing the qualifications the states set for elections to

17

the state legislature's "most numerous Branch." *Mitchell*, 400 U.S. at 289 (Stewart, J., concurring in part and dissenting in part). "Gouverneur Morris moved to strike" that language piggybacking on rules set by the states and to either "provide a freehold limitation on suffrage or to add a clause permitting Congress to alter the electoral qualifications." *Id.* at 290; *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 232 (1986) (Stevens, J., dissenting) (tracing the same debate). In response, George Mason warned that "[a] power to alter the qualifications would be a dangerous power in the hands of the [federal] Legislature." Farrand, *supra*, at 202. Echoing the point, James Madison argued that the issue of voter qualifications "ought not to be left to be regulated by the [federal] Legislature." *Id.* at 203. Those arguments won the day, as the framers rejected Morris's motion, and with it, the notion that Congress might regulate voter qualifications.

Nor was that debate confined to the framers in Philadelphia. Alexander Hamilton made precisely the same point in response to Anti-Federalist fears that Congress might borrow a page from Gouverneur Morris and try to limit suffrage by imposing a property requirement. He explained that "prescribing qualifications of property …for those who may elect … forms no part of the power to be conferred upon the national government." The Federalist No. 60, p. 369 (C. Rossiter ed. 2003) (A. Hamilton). Instead, Hamilton explained, "The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined

18

and fixed in the Constitution, and are unalterable by the legislature." *Id*. Hamilton's was hardly an "isolated view." *ITCA*, 570 U.S. at 32 (Thomas, J., dissenting) (collecting sources).

The post-Civil War Amendments point to the same conclusion—subject to some newly introduced constitutional constraints, states—not the federal Congress—set voter qualifications. Thomas Cooley, in updating Story's *Commentaries*, explained that the Fifteenth Amendment reflected "no thought or purpose … of conferring upon Congress the authority to regulate, or to prescribe qualifications for, the privilege of the ballot." Joseph Story, *Commentaries on the Constitution of the United States* §1972 (Thomas M. Cooley ed., 4th ed. 1873), p 689. "From the beginning," he noted, "the States had exercised that authority," and while the Fifteenth Amendment remedied "a particular evil"—*i.e.*, preventing citizens from voting on the basis of race—"whatever else was wrong or impolitic" with voting laws was "left to the action of the States where the subject was left when the Constitution was framed." *Id*.

In fact, versions of the Fourteenth Amendment were proposed that would have "granted Congress plenary control over the franchise," but they were rejected. Jeffrey Rosen, *Divided Suffrage*, 12 Const. Comment. 199, 200 (1995). Thus, while the Reconstruction Amendments imposed certain limits on states' powers to limit the franchise—and gave Congress power to enforce those specific guarantees—states

19

otherwise retained their power to set voter qualifications.  *Cf. Dorsey v. Brigham*, 177 Ill. 250, 260 (1898) (noting that, as to "the power of the federal government to declare the qualifications of voters," the federal government "has never attempted to exercise such power"); *ITCA*, 570 U.S. at 26 (Thomas, J, dissenting) ("Congress has no role in setting voter qualifications … aside from the powers conferred by the Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments, which are not at issue here.").[8]

In terms of precedent, *ITCA* supports the view that states (and states alone) set voter qualifications.  Writing for the Court, Justice Scalia explained that Article I's Qualifications Clause and the Seventeenth Amendment (along with Article II, §2, cl. 2) sent a clear message:  States set voter qualifications, and "nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress."  *Id.* at 16 (quoting *Mitchell*, 400 U.S. at 210  (Harlan, J., concurring in part and dissenting in part)).  The dissenting Justices agreed.  Justice Thomas concluded that "text and history confirm that States have the exclusive authority to set voter qualifications," *id.* at 26 (Thomas, J., dissenting), and Justice

---

[8] The government does not seem to have invoked any enforcement powers under these amendments in litigation involving §611, and, for reasons Cox explains, it is not clear how the government could do so.  *See* Dkt.30 at 6-7.

Alito likewise concluded that "the Constitution reserves for the States the power to decide who is qualified to vote in federal elections," *id.* at 42 (Alito, J., dissenting).

### B.   History And Precedent Indicate That a Citizenship Requirement is a Voter Qualification.

There is little doubt that a law limiting the franchise to citizens constitutes a voter qualification.  *ITCA* offers a simple definition of voter qualifications: a regulation of "*who* may vote."  570 U.S. at 16; *cf.* Natelson, *supra*, at 21 (using "identity" as a synonym for "qualifications").  That simple commonsense definition is buttressed by the Religious Test Clause in Article VI, clause 3 of the Constitution, which provides that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."  That language forbids rules— or qualifications—limiting the holding of offices to people of certain faiths.  In a similar way, rules that limit who may vote are voter "qualifications."

Both history and precedent reinforce that citizenship is a voter qualification and one that is fully within the scope of states' power over such matters.  In particular, history refutes any notion that citizenship, unique among voter qualifications, was a concept so inherently national in scope that only the federal government could address it.  To the contrary, as discussed above, many states before and after the Constitution's ratification allowed some noncitizens to vote.  *See supra*, at 3-10; *cf. Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020) (en banc) (discussing pre- and post-founding practice of disenfranchising felons).  And when

21

noncitizen suffrage disappeared, it did so because states changed their voter qualifications. *See supra*, at 10-11.[9]

On this point, antebellum decisions provide additional insight. In 1840, the Illinois Supreme Court noted that Congress, in "erecting and regulating the territorial government," both "prescribed the qualification of voters" and "gave to aliens as well as citizens the right of electing and being elected to office." *Spragins v. Houghton*, 3 Ill. 377, 394 (1840). After achieving statehood, the court noted, Illinois continued to allow for noncitizen suffrage. *See id.* at 397-98. As to voter qualifications for the House, *Spragins* observed, "[t]he constitution of the United States … is wholly subordinate to the legislative will of the state; whatever it prescribes is adopted, as the qualification of the voter for member of congress." *Id.* at 395–96. At the United States Supreme Court, the practice of noncitizen voting drew comment in *Dred Scott v. Sandford*. There, Chief Justice Taney's infamous opinion observed that "in some of the States of the Union foreigners not naturalized

---

[9] Exactly how many states allowed noncitizen voting is difficult to say. *Compare* Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Poli. Sci. Rev. 114, 114 (1931) (stating "at least twenty-two states and territories granted aliens the right to vote"), *with* Hayduk, *supra*, at 323 (stating that "forty states enacted laws allowing noncitizens to vote … between 1776 to 1926."), *and* Keyssar at 390 n.32 ("[T]here is some uncertainty about the number of states that ever had alien suffrage provisions in part because such provisions may have appeared in statutes rather than constitutional clauses"); *see also id.* at 315-19 (table showing states with race and citizenship requirements for suffrage from 1790-1855); *id.* at 337-39 (table showing states with special provisions for alien suffrage from 1870 to 1926).

22

are allowed to vote." 60 U.S. 393, 422 (1857). Those decisions, too, support the view that whether voters must be citizens is a question long answered by the states.

Contrast all that with the Constitution of the Confederate States of America. In many respects, the Confederacy's constitution was a cut-and-paste job, as it borrowed heavily from the federal Constitution. But where it addressed the electorate for its House of Representatives, the Confederacy's constitution deviated from the federal model by including an express citizenship criterion (bolded here):

> The House of Representatives shall be composed of members chosen every second year by the people of the several States; and the electors in each State **shall be citizens of the Confederate States, and** have the qualifications requisite for electors of the most numerous branch of the State Legislature; **but no person of foreign birth, not a citizen of the Confederate States, shall be allowed to vote for any officer, civil or political, State or Federal.**

Conf. Const. of Mar. 1861, art. I, §1, cl.1 [text available: https://perma.cc/G4ZT-BBYE]. The Confederacy's felt need to depart from the federal Constitution on this point lends further support to the conclusion that citizenship is a voter qualification.[10]

---

[10] The framers also knew how to make citizenship a qualification. *See, e.g.*, U.S. Const. art. I, §2, cl. 2 (for the House, "No Person shall be a Representative who shall not have … been seven Years a Citizen of the United States"); U.S. Const. art. I, §3, cl. 3 ("No Person shall be a Senator who shall not have … been nine Years a Citizen of the United States"); U.S. Const. art. II, §1, cl. 5 (requiring the President to be "a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution").

Postbellum sources bolster the view that citizenship is the sort of voter qualification states control.  "The conditions for the exercise of the elective franchise are established by every State for itself," Thomas Cooley observed in 1868.  Thomas M. Cooley, *A treatise on the constitutional limitations which rest upon the legislative power of the States of the American Union* 599 (1868).  Cooley went on to note that although "[w]omen, minors, and aliens are excluded in all the States from participation in the general elections," nonetheless "in some the alien becomes qualified after a certain residence, if he has declared his intention to become a citizen."  *Id.*  About a decade after the Civil War, the Supreme Court recognized the prevalence of declarant-alien suffrage.  "[C]itizenship," the Court observed, "has not in all cases been made a condition precedent to the enjoyment of the right of suffrage."  *Minor v. Happersett*, 88 U.S. 162, 177 (1874).  Thus, the Court continued, "in Missouri, persons of foreign birth, who have declared their intention to become citizens of the United States, may under certain circumstances vote," and the same held true in "Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Minnesota, and Texas."  *Id.*  Even after the Civil War, the Constitution generally left voter qualifications (including citizenship) to the states.  *See, e.g.*, M. A. Lesser, *Citizenship and Franchise*, 4 Colum. L. T. 113, 116-18 (1891).

And while noncitizen suffrage receded around the turn of the century, that movement also reflected states' choices.  Thus in 1904, the Supreme Court remarked

24

that a "state might provide that persons of foreign birth could vote without being naturalized," as some states had. *Pope v. Williams*, 193 U.S. 621, 633-34 (1904). Even critics of alien suffrage recognized that states had the option to allow it. While lamenting the fact that not a few states still permitted alien voting during the midst of the First World War, one advocate for citizens-only voting submitted that "[t]he remedy for the whole situation lies with the states themselves. Let them retrace their mistaken steps." *Alien Voters in the States*, 2 Const. Rev. 176, 178 (1918).

*ITCA* reinforces the conclusion that this issue belongs to the states. There, the Court recognized that states possess "constitutional authority to establish qualifications (*such as citizenship*) for voting." 570 U.S. at 16 (emphasis added). That aligned with decisions rejecting the idea that "aliens have a constitutional right to vote" and making clear that "citizenship is a permissible criterion for limiting" that right and others. *Sugarman v. Dougall*, 413 U.S. 634, 648-49 (1973). *See also, e.g.*, *Foley v. Connelie*, 435 U.S. 291, 296 (1978) (recognizing that "a State may deny aliens the right to vote").

More recent actions by states likewise confirm that citizenship is the sort of voter qualification states can regulate. In the last decade, for example, North Dakota and at least 14 other states have amended their constitutions to limit voting to citizens. *See* National Council of State Legislatures, "Legislative Approaches to Ensuring Only Citizens Vote," (Apr. 27, 2026) https://www.ncsl.org/elections-and-

25

campaigns/legislative-approaches-to-ensuring-only-citizens-vote (last visited July 22, 2026).  Recently, too, some proponents of limiting the right to vote to citizens have acknowledged that citizenship is the sort of voter qualification that—short of a constitutional amendment—only states can regulate.[11]

### C.     Section 611 Effectively Sets a Voter Qualification.

The final question is whether §611 sets a voter qualification.  The best reading of the statute as a whole, including its "unless" clause, suggests that §611 purports to do just that.

Section 611 makes it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing" the President, a senator, or a member of the House.  18 U.S.C. §611(a).  By forbidding aliens from voting in any such election on pain of criminal sanctions, §611 functions practically as a voter qualification—it answers the question "*who* may vote."  *ITCA*, 570 U.S. at 16; *see* Stephen E. Mortellaro, *The Unconstitutionality of the Federal Ban on Noncitizen Voting and Congressionally-Imposed Voter Qualifications*, 63 Loy. L. Rev. 447, 450-51 (2017) ("This provision is a 'voter qualification' law: it prescribes a substantive eligibility requirement (here, citizenship) and disenfranchises anyone who does not satisfy

---

[11] *See, e.g.*, Bradley A. Smith, *Wall St. J.*, *The Constitution Could Let Noncitizens Vote* (Apr. 6, 2026), https://www.wsj.com/opinion/the-constitution-could-let-noncitizens-vote-bee06b3f (last visited July 22, 2026); Graves Garrett Greim, Memorandum to Americans for Citizen Voting (Apr. 15, 2026), https://perma.cc/8HJN-SU45.

it.").  Reinforcing that conclusion, scholars with contrasting views of Congress' power (or lack thereof) to set voter qualifications have recognized §611 as a "congressionally imposed voting qualification[]." Nicholas O. Stephanopoulos, *The Sweep of the Electoral Power*, 36 Const. Comment. 1, 53 & n.307 (2021); *see* Joshua Kleinfeld & Stephen E. Sachs, *Give Parents the Vote*, 100 Notre Dame L. Rev. 1201, 1253 & n.169 (2025) (discussing exclusive state authority to set voter qualifications and then citing §611 to illustrate the point that "Congress hasn't always abided by these restrictions").   At times, the government seemingly concedes that §611 operates as a voter qualification.  *See* Dkt.32 at 4 (embracing view that Congress may "regulate congressional elections, including the age and other qualifications of the voters" (quoting *Mitchell*, 400 U.S. at 122) (op. of Black, J.)).

That said, it could be argued, as explained more fully below, that §611 should be understood less as a standalone (and constitutionally problematic) federal voter qualification and more as an "enforcement mechanism" designed to enforce the by-now-uniform state prohibitions on alien voting in, *inter alia*, federal elections.  So construed, the provision would likely be constitutional, as the federal government has a distinct interest in ensuring that voter qualifications set by the states are honored in federal elections.  The principal obstacle to this construction of the statute lies in §611's "unless" clause; it shows that §611 expressly contemplates the possibility that states could allow alien voting in certain non-federal elections and

27

nonetheless purports to criminalize alien voting in federal elections. Thus, as explained more fully below, the most faithful construction of the statute as a whole is that §611 sets a voter qualification for federal elections.

## II.   Arguments In Favor Of §611's Constitutionality Face Substantial Obstacles.

### A.   Some Precedent Suggests Congress May Set Voter Qualifications, But The Supreme Court's Latest And Most Apposite Precedent, *ITCA*, Says Otherwise.

The Supreme Court has made clear that the federal government, and Congress in particular, has substantial authority over the conduct of elections for federal office. Much of that authority flows from Article I, §4, which as relevant here, provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, §4, cl. 1. The Supreme Court has taken that language to grant Congress "authority to provide a complete code for congressional elections, not only as to times and places, but in relation to" much else, including "prevention of fraud and corrupt practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Likewise, the Court has recognized Congress' power to prevent corruption and fraud in presidential elections. *See Burroughs v. United States*, 290 U.S. 534, 545-46 (1934); *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) (noting "the broad power given

28

to Congress over congressional elections has been extended to presidential elections").

As the government highlights, Dkt.41 at 6, the Supreme Court invoked many of these authorities to uphold the constitutionality of legislation requiring the states to allow citizens 18 and up to vote in federal elections. *See Oregon v. Mitchell*, 400 U.S. 112 (1970). The government reads *Mitchell* to mean that as to "federal elections," Congress can "dictate certain voter eligibility restrictions to the states," including those imposed by §611. Dkt.32 at 4; *see also* 4-7; Dkt.44 at 1.

The proposition that *Mitchell* permits Congress to set voter qualifications for federal elections is not without support. Indeed, the Supreme Court itself once said as much in dictum: "With respect to elections to federal office … the Court has held that Congress has power to establish voter qualifications." *Kusper v. Pontikes*, 414 U.S. 51, 57 n.11 (1973) (citing *Mitchell*). Others have read *Mitchell* the same way. *See, e.g.*, Stephanopoulos, *supra*, at 52 (reading *Mitchell* to mean that "Congress can even regulate who votes (not just how voting is conducted) in congressional elections").

But the Court's more recent cases have not repeated that view of *Mitchell*, and a majority of the Court in *ITCA* appears to have affirmatively rejected it. In *ITCA*, the Court discussed *Mitchell* at considerable length, explaining that there, "the judgment of the Court was that Congress could compel the States to permit 18-year-

29

olds to vote in federal elections," but that *Mitchell*'s "result" lacked a "majority rationale." *ITCA*, 570 U.S. at 16 n.8. As such, the Court said, *Mitchell* was of "minimal precedential value." *Id.* In light of *ITCA*, the same would appear to be true here, too.[12] Yet the government neither confronts *ITCA* nor explains why a splintered decision like *Mitchell* should be stretched far beyond its own facts. Reading *Mitchell* to its limits and as if it were the Supreme Court's last word would defy both the Supreme Court's general teaching that its "opinions dispose of discrete cases and controversies and … must be read with a careful eye to context," *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023), and the Supreme Court's own treatment of *Mitchell* in *ITCA*. Not only that, but a maximalist view of

---

[12] In addition to the voter-age judgment that *ITCA* discussed, the *Mitchell* Court "unanimously upheld a nationwide ban on literacy tests and by an 8-1 margin upheld limitations on residency requirements in presidential elections." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1557 (11th Cir. 1984). The Court's decision on those fronts does not seem especially salient here. All nine Justices agreed that Congress "can prohibit the use of literacy tests or other devices used to discriminate against voters on account of their race in both state and federal elections." *Mitchell*, 400 U.S. at 118 (op. of Black., J.). And all save for Justice Harlan also upheld Congress' legislation on residency requirements for presidential elections, but no rationale commanded a majority there, either. *See* 400 U.S. at 134 (op. of Black, J.) (relying on Congress' power to "regulate federal elections"); *id.* at 150 (op. of Douglas, J.) (relying on §5 of the Fourteenth Amendment); *id.* at 236 (op. of Brennan, J., joined by White and Marshall, JJ.) (same); *id.* at 285-87 (op. of Stewart, J., joined by Burger, C.J., and Blackmun, J.) (relying on the Necessary and Proper Clause and a right to interstate travel).

30

*Mitchell* is in considerable tension with the Constitution's text, original understanding, and much of American history.

> **B.  Congress' Power Over Immigration is Undoubtedly Substantial, But That Does Not Empower Congress to Disturb The Constitution's Express Resolution of Questions Concerning Voter Qualifications.**

Even if Congress cannot set other voter qualifications, one might think Congress' power over immigration allows it to criminalize voting by aliens. Congress, after all, has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I, §8, cl. 4 (granting Congress power "[t]o establish an uniform Rule of Naturalization"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). On this view, §611 is best understood not as a "qualification to vote," but as a "criminal immigration sanction." *See, e.g.*, Opp'n. to Mot. to Dismiss at 1, *United States v. Murillo*, No. 3:26-mj-00004-amb (W.D. Wis. filed May 15, 2026), Dkt.17 at 1.

Cox submits that this line of argument entails granting Congress "a general police power over aliens." Dkt.42 at 3. That appears to be an overstatement. Unlike a hypothetical prohibition on all alien voting, including in state and local elections, §611 exists at the intersection of Congress' immigration power *and* its power to

31

regulate federal elections.  *See Smiley*, 285 U.S. at 366.  In that respect, §611 could be said to involve federal interests squared.  There is ample precedent supporting Congress' power to regulate immigration and to protect the integrity of federal elections.  *See* Dkt.32 at 2-3; Dkt.42 at 5.  And that combination of federal powers— rather than a sweeping power to criminalize any conduct by aliens—might be thought to justify §611.  *Cf. Burroughs*, 290 U.S. at 545 ("Congress … possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption").

Yet this argument has its limitations.  After all, the principal concern with §611 is not that Congress lacks an affirmative grant of power sufficient to enact criminal prohibitions on alien voting, but rather that establishing federal voter qualifications contradicts the specific constitutional provisions establishing voter qualifications for federal congressional elections and granting states the authority to establish qualifications for presidential elections.  "Even so-called plenary powers cannot override foundational constitutional constraints," *Haaland v. Brackeen*, 599 U.S. 255, 276 n.3 (2023) (brackets omitted), and the constitutional constraints on establishing voter qualifications are indeed foundational ones.  Madison was not alone in thinking that "[t]he qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution," because

32

"[i]f the Legislature could regulate those of either, it can by degrees subvert the Constitution." Farrand, *supra*, at 249-50. In line with that thinking, the Supreme Court has explained that the "allocation of authority" over voter qualifications in general, and the decision not to simply assign this power to the new federal Congress in particular "sprang from the Framers' aversion to concentrated power." *ITCA*, 570 U.S. at 17.

The Constitution's express "allocation of authority" over voter qualifications makes it difficult to see how Congress could simply ban noncitizen voting without regard to state laws on the subject and not trespass those constitutional boundaries. Indeed, as to the "Elections Clause"—*i.e.*, U.S. Const. art. I, §4, cl.1—*ITCA* explained that courts "cannot read [that clause] as treating implicitly what these other constitutional provisions regulate explicitly." 570 U.S. at 16. The same would seem to hold true for Congress' power over immigration. Even if one assumes that affirmative power is nearly plenary, it does not empower Congress to revisit or override what "other constitutional provisions regulate explicitly." *Id.* Congress' power over immigration would not empower it to override the constitutional prohibition on an immigrant serving as President of the United States or to require someone to be a citizen for ten years before serving as a Representative. The constitutional problem with such congressional efforts would not be a lack of affirmative power over immigration, but that other provisions of the Constitution

33

settled the matter directly. *See* art. II, §1, cl. 5; art. I, §2, cl. 2. The same logic would appear to limit Congress' power to set voter qualifications for federal elections when it comes to aliens.

This argument nonetheless underscores that Congress could exercise its substantial authority over immigration and federal elections in ways that respect the Constitution's "allocation of authority" over voter qualifications in federal elections. It would, for example, be difficult to identify a constitutional flaw in a federal statute that made it a federal crime for an alien to vote in a federal election in violation of a voter qualification set by the states. Such a law would exercise Congress' powers over immigration and federal elections in a manner that affirmatively respected the constitutional provisions giving states the authority to set voter qualifications for federal elections and would draw support from cases like *Smiley* and *Burroughs. See, e.g.*, *Smiley*, 285 U.S. at 366 (addressing congressional authority to legislate for "prevention of fraud and corrupt practices").

The likely constitutionality of a hypothetical federal law that merely enforced state voter qualifications in federal elections raises the prospects that §611 could be construed in such a fashion or could be treated as constitutional as applied in states that themselves prohibit alien voting (which is currently all the states). The latter argument could also be framed in terms of standing. One could argue, for example, that an alien in a state that prohibits aliens from voting lacks standing to raise any

34

objection to any federal-qualification-based issue with the statute, and that the statute is constitutional as applied to the defendant.  Phrased another way, insofar as aliens in Florida are in fact disqualified from voting in federal elections—albeit as a result of Florida law rather than via the direct operation of §611—an alien prosecuted under §611 lacks standing to press the argument that §611 would be unconstitutional as applied to an alien authorized by state law to vote in the election for the state's most numerous legislative body.  Indeed, at least one commentator has attributed the scarcity of caselaw on the subject of §611's constitutionality to "the lack of people who have standing to challenge the law because no state currently allows noncitizens to vote in statewide elections."  Andrew C. Scarafile, *Regulation or Qualification: The Qualifications Clause, the Elections Clause, and Federal Regulation of Mail-in Ballots*, 36 Notre Dame J.L. Ethics & Pub. Pol'y 709, 716 n.54 (2022).

While an argument along these lines likely provides the strongest basis for defending the constitutionality of §611 in this case, the statutory text poses a problem for these theories.  Especially in light of its "unless" clause, it is hard to faithfully read §611 as anything but a nationwide ban on noncitizen voting.  Indeed, the government has elsewhere described it as a "noncitizen voting ban." *Murillo*, *supra*, Dkt.17 at 2.  Moreover, §611 is not keyed to an underlying violation of state law.  That is telling because Congress plainly knows how to draft a statute that makes an immigration sanction turn on a violation of state law.  In that respect, §611 contrasts

35

with 8 U.S.C. §1227(a)(6)(A), which makes deportable any alien who has "voted in violation of any … State … constitutional provision, statute, ordinance, or regulation."

The more fundamental challenge to a possible saving construction of §611 along these lines lies in the statute's "unless" clause, which makes clear Congress' intent to prohibit an alien from voting in a federal election even when permitted by state law. Section 611 makes it "unlawful" for an alien to vote in an election held in part to elect the President or a member of Congress, "*unless*" (1) the election is partly for another purpose; (2) state or local law allows aliens to vote for that purpose; and (3) voting for that purpose is "conducted independently of voting for a candidate for … Federal offices." 18 U.S.C. §611(a). That limited exception for state-authorized alien voting in non-federal elections leaves no doubt that Congress plainly intended to prohibit alien voting in federal elections even when affirmatively authorized by state law. Put differently, any fair reading of §611 as a whole makes clear that Congress plainly intended to address matters that the Constitution either settles directly (as with congressional elections) or expressly delegates to the states (as with presidential elections).

The remaining question is whether this Court can save §611 from constitutional invalidation either by a narrow construction or by finding the statute constitutional as applied to Cox or that Cox lacks standing to raise a successful

36

challenge. While those are close and difficult questions, the better view (and the one ultimately more faithful to Congress' clear intent) appears to be that the statute cannot constitutionally be applied to Cox. First, there is no obvious saving construction available to limit the statute's application to situations where the alien's voting in the federal election violates state law. As 8 U.S.C. §1227(a)(6)(A) demonstrates, a federal statute keyed to a violation of state law is a very different animal from a statute that purports to impose a federal criminal penalty on certain individuals who vote in the federal election without regard to state law. Moreover, the "unless" clause makes clear that Congress did not intend to defer to state law or limit the federal prohibition to alien voting in defiance of state law. *See* 18 U.S.C. §611(a). And striking the "unless" clause does nothing to solve the constitutional problem. Even without the "unless" clause, the statute still includes a broad and unqualified federal prohibition on alien voting. Thus, severing the "unless" clause would not avoid the constitutional problem, but only sweep the most damning textual evidence of Congress' overambitious intent to set a federal voting qualification under the proverbial rug.

That leaves the question of whether Cox has standing to raise the constitutional defect with §611 given that Florida (like every other state) currently bans voting by aliens. This may be the closest and most difficult question in the case. It is far from obvious that §611 is unconstitutional in all its applications.

*Contra* Dkt.30 at 1 (maintaining that "§611 is facially unconstitutional"); *see United States v. Salerno*, 481 U.S. 739, 745 (1987). For example, §611 by its terms reaches federal elections in the District of Columbia where there is no applicable state law setting voter qualifications. *See* 18 U.S.C. §611(a) (criminalizing aliens voting in elections involving the "Delegate from the District of Columbia"). There is no apparent reason that Congress' plenary authority over the District would not allow Congress to prohibit alien voting, *see* U.S. Const. art. I, §8, cl. 17, and nothing in the constitutional provisions authorizing states to set voter qualifications would apply to the District. Thus, it does not appear that an alien prosecuted for voting in federal elections (*e.g.*, for President or Delegate) in the District would have any valid basis to challenge §611's constitutionality.

But that conclusion does not follow for Cox. Cox is being prosecuted for voting in a federal election in Florida; the Constitution clearly prohibits the federal Congress from setting a federal voting qualification in that election; and any fair reading of §611 yields the conclusion that Congress intended to do precisely what the Constitution forbids. A criminal defendant has undeniable standing to challenge the constitutionality of the statute under which he is being prosecuted, *see, e.g., Bond v. United States*, 564 U.S. 211, 223-24 (2011) (recognizing that "a litigant, in a proper case, [may] challenge a law as enacted in contravention of constitutional principles of federalism"), and the fact that Congress could have drawn a narrower statute that

38

captured the defendant's conduct is no barrier to standing or relief. For example, the constitutional defect with some criminal statutes could be remedied by the simple expedient of adding a jurisdictional element. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 561 (1995) (holding provision of Gun-Free School Zones Act of 1990 unconstitutional in part because it contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce"). But that does not mean that a criminal defendant lacks standing to challenge the absence of a jurisdictional element when it is obvious from the record that a hypothetical jurisdictional element would be satisfied. After all, "[v]irtually all guns have moved in commerce or 'affect' commerce," *United States v. Pope*, 871 F.2d 506, 509 (5th Cir. 1989), but that did not change the bottom line in *Lopez*. Even if a differently worded law might provide a basis for a prosecution, it nonetheless remains true that "[a]n offence created by [an unconstitutional law] is not a crime." *Ex parte Siebold*, 100 U.S. 371, 376 (1880). That reasoning would seem to apply here. The fact that Cox could have been prosecuted under a constitutional statute keyed to violations of state law does not deprive her of standing to challenge the constitutionality of the differently worded and more sweeping statute Congress actually enacted.[13]

---

[13] For the sake of completeness, it is possible that the government could contend that §611 is necessary to secure to the states a "Republican Form of Government." U.S. Const. art. IV, §4. Senator Simpson, in his introduction of §611, argued as

Finally, to support §611's constitutionality, the government also invokes 52 U.S.C. §30121(a), which criminalizes campaign contributions by foreign nationals to federal, state, and local campaigns. Dkt.44 at 2-3. On its view, if "Congress has the power to prevent a foreign national from contributing $50 to a local city council race," then surely it can prevent that same person from voting in a federal election. *Id.* at 3; *see also United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020) (upholding the constitutionality of 52 U.S.C. §30121(a)).

But §30121(a) is fundamentally unlike §611. To begin, the two laws cover different (though overlapping) populations, as §30121(a) applies to "foreign national[s]" but not certain noncitizens, including individuals "lawfully admitted for permanent residence." *See* §30121(b); *Singh*, 979 F.3d at 710 n.3.[14] But what really

---

much. *See* 142 Cong. Rec. S4018-19 (1996) (statement of Sen. Simpson). But whatever authority the Guaranty Clause grants Congress, that would not authorize Congress to establish voter qualifications that defy the specific constitutional provisions allocating authority to set qualifications. After all, as noted, the problem with §611 is not a lack of affirmative congressional power, but the direct conflict with constitutional provisions assigning the responsibility to set voter qualifications for federal elections elsewhere. Moreover, whatever limits there may be on the justiciability of Guaranty Clause claims would not insulate a violation of the constitutional provisions giving states—and not the federal Congress—the authority to determine voter qualifications.

[14] Lawful permanent residents differ from other aliens in key respects, including that "lawful permanent residents may—and do, in large numbers—serve in the United States military," *Bluman v. FEC*, 800 F.Supp.2d 281, 291 (D.D.C. 2011) (Kavanaugh, J.), and must pay taxes on the same bases as U.S. citizens, *Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1255 (11th Cir. 2025).

40

sets §30121(a) apart from §611 is that the former does not set a voter qualification, and it appears that the latter does. *See supra* Part I.  Again, no one disputes that Congress has broad power to legislate with respect to aliens.  But that legislative power cannot override the Constitution's express resolution of the issue of voter qualifications.  A campaign-finance law is a far cry from a voter qualification, thus reasoning by analogy to §30121(a) does not aid the government's case.

### C. Holding §611 Unconstitutional May Have Significant Consequences, But That Does Not Alter The Constitutional Analysis.

As the government notes, some profound consequences might follow from a decision holding §611 invalid.  *See, e.g.*, Dkt.41 at 7.  For example, the government warns that a decision adverse to it might endanger the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA"), the legislation "which provides the legal basis for these citizens' absentee voting requirements for federal offices."  *Id.*; Dkt.44 at 2.  That may or may not be so.  Some scholars have questioned whether UOCAVA fully comports with the Constitution.  *See, e.g.*, Brian C. Kalt, *Unconstitutional but Entrenched: Putting UOCAVA and Voting Rights for Permanent Expatriates on A Sound Constitutional Footing*, 81 Brook. L. Rev. 441, 442 (2016).  Others, however, have noted that "UOCAVA has never faced a serious legal challenge, no doubt in part due to the politically-fraught position of a plaintiff requesting the federal courts to strip military and overseas voters of federal voting

opportunities." Derek T. Muller, *Twenty-Third Amendment Problems Confronting District of Columbia Statehood*, 2021 Harv. J.L. & Pub. Pol'y Per Curiam 11, 8 (2021). In the event that UOCAVA were successfully challenged, states would be free to adopt uniform laws modeled on UOCAVA or even more favorable rules, as some states have done (UOCAVA sets a floor, not a ceiling). *Cf. id.* (recognizing that states could "voluntarily accede to UOCAVA's rules even after it were found unconstitutional"). Or perhaps, instead of being read as a voter qualification that sets out "'who' can vote in federal elections," Dkt.44 at 2, UOCAVA would be understood as a regulation of the "Manner" in which an election is conducted, Dkt.45 at 2-3. Whatever the ultimate outcome of that debate, it should not impact the resolution of the question here.

None of that is to say Congress is disabled from taking action on this issue. As already indicated, Congress would appear to be able to enact a law that criminalizes alien voting in violation of state law. Given that every state currently bans voting by aliens, the practical impact of such a law would be equivalent to §611, while fully abiding by the Constitution's allocation of authority over voter qualifications. And if Congress wants a more permanent solution, as ever, the Constitution provides a mechanism for change. *See* U.S. Const. art. V. In fact, recently, Representative Laurel Lee of Florida introduced a joint resolution proposing an amendment that would reserve the right to vote in federal elections to

citizens. *See* H. J. Res. 152, 119th Cong. §1 (2026) [text available: https://perma.cc/P32T-GP3T]. Such an amendment could achieve what ordinary legislation may not.

## CONCLUSION

This Court appointed *amicus curiae* to address "the constitutional authority of Congress to enact 18 U.S.C. §611." Dkt.37 at 2. Whether Congress had the power to enact §611 is not entirely clear-cut, but with respect to noncitizens in the States, the best answer given a fair reading of §611 as a whole appears to be no.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
CHADWICK J. HARPER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

* Supervised by principals of the firm who are members of the Virginia bar

*Court-Appointed* Amicus Curiae

July 22, 2026

43

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2026, I filed the foregoing with the United States District Court for the Southern District of Florida via email, and that service will be accomplished via email to counsel for the parties.

<u>s/Paul D. Clement</u>
Paul D. Clement