**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CR-60249-LEIBOWITZ**

**UNITED STATES OF AMERICA**

**v.**

**CHELSEA MICHELLE ANN COX,**

      **Defendant.**

                            /

**UNITED STATES OF AMERICA'S RESPONSE TO MEMORANDUM OF**
**COURT APPOINTED AMICUS CURIAE**

The United States of America respectfully submits this response to the memorandum submitted by the court-appointed amicus curiae, Paul Clement ("Amicus"). *See* ECF No. 43.

18 USC § 611 is a longstanding, common sense law that is firmly rooted in Supreme Court precedent and inherent Congressional power.

I.      **Amicus cannot reconcile its position with the binding judgment in *Oregon v. Mitchell.***

*Oregon v. Mitchell*, 400 U.S. 112 (1970), remains the Supreme Court's definitive case concerning Congress's power to regulate who may vote in federal elections.  In 1970, Congress passed certain amendments to the Voting Rights Act of 1965 that regulated who may vote in state and federal elections.  84 Stat. 314 (1970).  In relevant part, these amendments did three things.  First, Congress prohibited, for a period of five years, the use of literacy tests to determine voter eligibility.  Second, Congress prevented states from disqualifying voters for president and vice president on the basis on state residency requirements.  Third, Congress lowered the minimum age of voters in both state and federal elections from 21 to 18.  In *Mitchell* the Supreme Court resolved disputes between the Federal Government and the states about Congress's constitutional authority

1

to enact each of these provisions.

On the literacy test ban, all nine justices accepted that this was a valid exercise of authority granted to Congress by the Fourteenth and Fifteenth Amendments. *Mitchell*, 400 U.S. at 118 (opinion of Black, J.); 400 U.S. at 144-45 (opinion of Douglas, J.); 400 U.S. at 235-36 (joint opinion of Brennan, White, and Marshall, JJ.); 400 U.S. at 216-17 (opinion of Harlan, J.); 400 U.S. at 282-83 (opinion of Stewart, J., joined by Burger, C. J., and Blackmun, J.). The Court was divided, however, on how to decide the constitutionality of the remaining provisions of the 1970 amendments.

Justices Douglas, Brennan, White, and Marshall were of the view that Congress had proper authority under the Fourteenth Amendment both to prevent states from disqualifying voters in presidential elections on the basis of residency requirements and to forbid states from disenfranchising persons over the age of 18 because of their age. *See* 400 U.S. at 135, 149 (opinion of Douglas, J.); 400 U.S. at 235-36 (joint opinion of Brennan, White, and Marshall, JJ.). On the other end of the spectrum, Justice Harlan took the view that neither the Fourteenth Amendment nor the Elections Clause (Art. I, § 4, cl. 1) provides Congress with any authority to regulate who may vote in federal or state elections. *See* 400 U.S. at 200-12 (opinion of Harlan, J.). Accordingly, he would have held both the age requirements and residency requirements to be unconstitutional. *See id.* at 212-17. Justice Stewart, joined by Chief Justice Burger and Justice Blackmun, agreed with Justice Harlan that Congress lacked authority – either under the Fourteenth Amendment or the Elections Clause – to regulate the voting age of the electorate in federal or state elections. *See* 400 U.S. at 281-82 (opinion of Stewart, J., joined by Burger, C. J., and Blackmun, J.). However, these three justices determined that Congress's restriction on state residency requirements was constitutional. They concluded that state residency requirements to vote could inhibit citizens

from moving between states, which is a privilege of citizenship, and thus Congress was empowered to take reasonable actions to preserve this right. *See id.* at 292.

It thus fell to Justice Black to deliver the judgments of the Court. Justice Black was the only justice to rely on the Elections Clause and he was also the only justice never to be in dissent in *Mitchell*. In Justice Black's view, the Elections Clause grants Congress ultimate authority over federal elections – including the qualifications of voters – however, Congress has no constitutional authority to regulate to conduct of state elections. 400 U.S. at 121-25 (opinion of Black, J.).

Accordingly, Justice Black – and the Court – upheld the restriction on residency requirements and held that the voting age mandate was constitutional insofar as it applied to federal elections but that it was unconstitutional to the extent it applied to state and local elections. *See* 400 U.S. at 117-19 (opinion of Black, J.).

Amicus concedes that the "proposition that *Mitchell* permits Congress to set voter qualifications for federal elections is not without support" (DE 46:29). Amicus quotes the following "dictum" from *Kusper v. Pontikes*, 414 U.S. 51, 57 n.11 (1973): "With respect to elections to federal office . . . the Court has held that Congress has power to establish voter qualifications" (DE 46:29). But the strongest "support" for this proposition is *Mitchell* itself. Justice Black could not have been clearer in describing the Court's holding in *Mitchell*.

> Our judgments today give the Federal Government the power the Framers conferred upon it, that is, the final control of the elections of its own officers. Our judgments also save for the States the power to control state and local elections which the Constitution originally reserved to them and which no subsequent amendment has taken from them.

*Mitchell*, 400 U.S. at 134-35 (opinion of Black, J.).

While the other justices obviously disagreed with Justice Black's rationale, and, in certain places, the outcomes it produced, not a single justice disputed that Justice Black accurately described the holding of the Court. Indeed, Congress has steadfastly relied on – and the states

have at least begrudgingly accepted – this holding for the past 55 years.[1]  It explains why Congress felt empowered to pass the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") and why that Act applies only to federal elections.  *See* 52 U.S.C. § 20302(a).  It also explains why § 611 itself has a carve out for state and local elections.  *See* 18 U.S.C. § 611(a).

Congress's view that *Mitchell* authorizes it to regulate federal elections – including voter qualifications – is a faithful reading of *Mitchell*, not a "maximalist" one (DE 46:30).  Amicus fails to explain how *any* fair reading of *Mitchell* – whether read to its limits or not – is consistent with his stated view that "the Constitution assigns states (and states alone) the power to set voter qualifications." (DE 46:13).  If nothing else, *Mitchell* clearly stands contrary to that claim as it allowed Congress to restrict voter qualifications on the basis of both age and residency.  *See Mitchell*, 400 U.S. at 117-19 (opinion of Black, J.).  Indeed, there seems to be no daylight between the views of Amicus and those of Justice Harlan, the one justice who was most often in dissent in *Mitchell*.

In departing from the clear holding of *Mitchell*, Amicus places tremendous – and unsustainable – weight on the Supreme Court's decision in *Arizona v. Inter Tribal Council of Arizona, Inc.* (*ITCA*), 570 U.S. 1, 16 (2013).  Amicus's reliance on *ITCA* is misplaced for numerous reasons.

Most notably, despite Amicus's assertion that *ITCA* is the "[m]ost [a]pposite [p]recedent" (DE 46:28), *ITCA*, unlike *Mitchell*, did not ask the Court to consider the constitutionality of a congressional statute or require it to determine the extent to which Congress may regulate who votes in federal elections.  *ITCA* was purely a statutory preemption case.  *See id.* at 4.  Justice Scalia's entire discussion of *Mitchell* in footnote 8 is plainly dicta.  *Mitchell* remains the most

---

1 Amicus does not offer an alternative explanation for how Congress should have understood *Mitchell*'s holding.

recent case in which the Supreme Court was called upon to decide Congress's constitutional authority to regulate who may vote in elections.

Furthermore, even in dicta, Justice Scalia did not purport to overrule *Mitchell*. Justice Scalia noted that *Mitchell* was of "minimal precedential value *here*," *id* at 16 n.8 (emphasis added). But that is hardly surprising given that *ITCA* did not concern Congress's authority to establish voter qualifications in federal elections.

Justice Scalia's recounting of *Mitchell* is also inexplicably incomplete. Justice Scalia begins footnote eight by writing: "In *Mitchell*, the judgment of the Court was that Congress could compel the States to permit 18–year–olds to vote in federal elections." *Id.* He then accurately describes the vote breakdown on that issue, highlighting the fact that no rationale commanded a majority of the Court. Curiously, however, he makes no mention of the other judgments in *Mitchell*, particularly the Court's 8-1 holding that Congress could prohibit states from imposing residency requirements in determining who is eligible to vote for president and vice president. It is not clear why Justice Scalia neglected to mention this key part of Mitchell's holding. Perhaps he did not want to explain why eight justices found this voter restriction to be constitutional.[2] In any event, precisely because this discussion of *Mitchell* was not necessary in deciding *ITCA*, Justice Scalia did not need to conduct a fulsome analysis of that case.

Finally, *ITCA* is not the "latest" Supreme Court precedent of some relevance here (*See* DE

---

2 Seven of those justices agreed that Congress could find that limitations on state residency requirements was legitimate legislation authorized, at least in part, by the Fourteenth Amendment. Justice Douglas held that the right to become a citizen of another state is protected by the Privileges or Immunities Clause of the Fourteenth Amendment and that Congress could legislate to vindicate that right under § 5 of that Amendment. *See Mitchell*, 400 U.S. at 150 (opinion of Douglas, J.). Justices Brennan, White, and Marshall did not identify a specific constitutional provision supplying the right to unhindered interstate travel and settlement, but they were certain of the right and of the fact that Congress could protect that right through § 5. 400 U.S. at 237-38 (joint opinion of Brennan, White, and Marshall, JJ.). Justice Stewart, joined by Chief Justice Burger and Justice Blackmun, also found that the freedom to travel from state to state was protected by the Privileges or Immunities Clause. He did not dispute that the residency restriction could be enacted pursuant to § 5 but he instead chose to ground Congress's authority in the Necessary and Proper Clause. 400 U.S. at 285-86 (opinion of Stewart, J., joined by Burger, C. J., and Blackmun, J.).

46:28).  Just a few months ago, the Supreme Court decided *Watson v. RNC*, 146 S. Ct. 2165 (2026), a case, argued by Amicus, in which the Court was asked to decide whether federal law required states to receive ballots by election day.  In holding that Mississippi's method of vote counting was not preempted by federal law, the Court relied heavily on UOCAVA to establish that Congress approved state post-election ballot receipt deadlines.  *Id.* at 2173.  As the Court explained, "UOCAVA requires States to permit absent military and overseas voters to cast absentee ballots in federal elections."  *Id.*  Admittedly, *Watson* is a statutory preemption case, not a constitutional one.  But, of course, the same can be said of *ITCA*.  And every justice still on the Court who was in the majority in *ITCA* was also in the majority in *Watson* and evidently had no qualms about relying on a federal law that plainly regulates who may vote in federal elections.

And, to be clear, to argue that UOCAVA is not a "who" regulation (*see* DE 45:2) fundamentally misunderstands what UOCAVA does and how it works.  UOCAVA *requires* states to accept votes in federal elections from certain American citizens living or working abroad whether a state would otherwise permit those voters to be a part of their electorate or not.  *See* 52 U.S.C. § 20302(a)(1).  Indeed, some states have created separate ballots for federal and state offices because they do not want citizens covered by UOCAVA to be eligible to vote in state and local elections.[3]  So, contrary to Amicus's view that Congress "must take the state rules concerning voter eligibility as a given and employ the rules used for the state's most numerous legislative body in congressional elections" (DE 46:14), as a practical matter that has not been how elections have operated in this country for some time.[4]  This is precisely because the judgment of *Mitchell*

---

3 *See* TEX. ELEC. CODE ANN. §§ 114.001–.003; WIS. STAT. § 6.24; 10 ILL. COMP. STAT. 5/20-1(4), (6), 5/20-2.2; CONN. GEN. STAT. §§ 9-158a(1), 9-158b, 9-158i; N.Y. ELEC. LAW § 11-200 (McKinney), 9 N.Y.C.R.R. §§ 6219.1–.2; DEL. CODE ANN. tit. 15, § 1901(b)(3); VA. CODE ANN. § 24.2-453; N.J. STAT. ANN. §§ 19:59-2(f), 19:59-3(b) (West).

4 If UOCAVA were to be held unconstitutional, any resulting harm would not be to the states but to overseas citizens who might become excluded from future federal elections depending on whatever voter registration scheme their

is that Congress has final authority over federal, but not, state elections.

Amicus simply cannot reconcile his view that the Constitution prohibits federal regulation of voter qualification rules with the binding judgment in *Mitchell*.   At best, Amicus offers a prediction of how today's Court might rule on this issue if given the opportunity to revisit *Mitchell*. Amicus's predictions may well be proven correct – and, candidly, there are few people better positioned to make such predictions than Amicus.   However, with respect, for purposes of this motion before this court, *Mitchell* must remain binding.   As the Supreme Court has repeatedly made clear, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals"—and, by extension, district courts— "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *see also State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

Defendant states, without citation to any authority, that "there is no precedent in *Mitchell* to overrule, given the absence of a majority rationale" (DE 45:2).   This is not correct.   Under *Marks v. United States*, when "no single rationale explaining the result enjoys the assent of five Justices," the Court's holding is "that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977).   And where no narrowest ground can be identified, a fractured decision's holding binds even if its reasoning does not.   *See Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1523 (11th Cir. 1994).   *Mitchell* therefore binds however one resolves the debate over its rationale: at a minimum, its judgment—that Congress may set voter qualifications in federal but not state elections—is a binding result this Court must follow.

---

respective home states decided to adopt.

**II.      Section 611 Can Independently Be Sustained As a Permissible Regulation on Aliens**

Section 611 can also be independently sustained on the basis of Congress's broad authority over immigration and foreign affairs (issues that were not at all raised in *Mitchell*).  As Amicus acknowledges, the Supreme Court has held that Congress has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); (DE 46:31).  But Amicus argues that this unquestionably broad authority must nevertheless yield to what "other constitutional provisions regulate explicitly" (DE 46:33).

In *Mitchell*, Justice Stewart, joined by Chief Justice Burger and Justice Blackmun, confronted this very same issue that Amicus now raises but reached the opposite conclusion.  As Justice Stewart explained when deciding the constitutionality of residency limitations, "[t]he issue, then, is whether, despite the intentional withholding from the Federal Government of a general authority to establish qualifications to vote in either congressional or presidential elections, there exists congressional power to do so when Congress acts with the objective of protecting a citizen's privilege to move his residence from one State to another." *See* 400 U.S. at 291-92 (opinion of Stewart, J., joined by Burger, C. J., and Blackmun, J.).  Justice Stewart ultimately concluded that Congress did have such power.  He cited several reasons for his conclusion, all of which are equally applicable to § 611 and Congress's power over immigration and foreign affairs.  First, he observed that the enacted legislation did not reflect "a general power to prescribe qualifications for voters," but was rather "confined to federal action against a particular problem clearly within the purview of congressional authority." *Id.* at 292.  Second, the issue was one "that cannot be left for exercise by the individual States without seriously diminishing the level of protection available." *Id.*  And, finally, he concluded by saying "[w]e should strive to avoid an interpretation of the Constitution that would withhold from Congress the power to legislate for the protection of those constitutional

8

rights that the States are unable effectively to secure."[5] *Id.* These considerations are equally relevant here. Foreign interference in elections is clearly within the purview of Congress. States, on their own, are not equipped to handle matters of immigration or foreign affairs and are not well situated to assess the extent to which foreign countries may be attempting to influence federal elections.

Amicus distinguishes 52 U.S.C. § 30121(a) on the grounds that a "campaign-finance law is a far cry from a voter qualification" (DE 46:41). This is of course true but seems to miss the point. The question is not whether a campaign-finance law is similar to a voter qualification law but rather whether there is any reason to believe the framers were more protective of a state's right to establish the qualification of voters in *federal* elections than they were of a state's right to determine campaign finance rules governing *purely state and local* elections. It is not at all clear why this would be so.[6]

[SPACE LEFT INTENTIONALLY BLANK]

---

[5] This issue about whether a general privilege of citizenship and the Necessary and Proper Clause can supplant an explicit constitutional grant of authority was one that only Chief Justice Burger and Justices Stewart and Blackmun addressed in *Mitchell*. Justices Black, Douglas, Brennan, White and Marshall did not need to confront it because they, for differing reasons, all accepted that Congress has ultimate control over federal elections anyway. Meanwhile, Justice Harlan did not address it because he did not accept the view that state residency requirements implicated the Privileges or Immunities Clause.

[6] If the response would be that the Constitution explicitly grants states the power to set voter qualifications that does not seem to be quite right, at least with regard to the House of Representatives. The Constitution states: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. 1, § 2 cl. 1. This requires that the electorate for the federal House be the same as the state counterpart, but this clause itself does not actually explicitly entrust this task to the states. Presumably it is a power otherwise reserved to the states but then so too is the power to regulate state and local elections.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: /s/ *George E. Doty III*
George E. Doty III
Assistant United States Attorney
Florida` Bar No. 1048779
N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9404
George.Doty@usdoj.gov


/s/ *Christopher Killoran*
Christopher Killoran
Assistant United States Attorney
Fla. Bar no. 27999
500 East Broward Blvd., 7th Floor
Fort Lauderdale, FL 33394
Tel: (954) 660-5669
Christopher.Killoran@usdoj.gov